The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before [Deputy] Commissioner Mavretic and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At the time of the injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between plaintiff and defendant-employer.
3. Defendant-employer is self-insured, with Crawford and Company as the servicing agent.
4. Plaintiff sustained an admittedly compensable injury by accident to his back on April 23, 1992.
5. Plaintiff's average weekly wage was $378.35, which yields a compensation rate of $252.25.
6. Industrial Commission Forms 18, 33, and 33R were stipulated into evidence.
7. Defendants have paid plaintiff the following compensation: temporary total disability compensation from February 4, 1993-July 11, 1993; temporary partial disability compensation from November 22, 1993-October 17, 1994 and from January 5, 1995-April 30, 1995; temporary total disability compensation from May 1, 1995-September 3, 1995; and temporary partial disability compensation from November 14, 1995-January 5, 1996.
8. The parties stipulated to the authenticity of plaintiff's medical records.
 **********
The Full Commission adopts the findings of fact found by the [Deputy] Commissioner, with minor modifications, as follows:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was forty-three years old. He has a GED and served 2 years in the Marine Corps.
2. Before starting glue reel work at Kincaid on April 11, 1991, plaintiff had operated heavy equipment for Blanton's Construction, had worked at Barnhardt's Furniture, had operated heavy equipment for John Woodie Construction Company — owned by his brother-in-law, and had worked previously for defendant-employer.
3. On April 23, 1992, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer when he strained to push a cart loaded with oak wood pieces and a wheel caught in a crack in the floor. As a result of this accident, plaintiff began to experience pain in his back and hips.
4. Plaintiff first saw Dr. Richard McBurney on May 22, 1992, and was diagnosed with back strain. Dr. McBurney returned plaintiff to work with a twenty five pound lifting restriction. Plaintiff continued to improve until June 4, 1992, when, in a hurry at work, he lifted too much. On June 5, 1992, Dr. McBurney returned plaintiff to work with a fifty pound lifting restriction, working no more than ten hours daily with no bending or flexion with lifting. Plaintiff returned to Dr. McBurney on January 12, 1993, at which time he began one week of therapy. On February 4, 1993, Dr. McBurney referred plaintiff to Dr. David Jones, a neurosurgeon. An MRI was performed revealing a herniated disc at L5-S1.
5. On March 30, 1993, Dr. David Jones performed a hemilaminotomy and diskectomy at L5-S1, referring plaintiff to physical therapy.
6. Dr. Jones released plaintiff to return to light duty work at defendant-employer on July 12, 1993, with a lifting restriction of no more than twenty five pounds frequently, and no more than forty pounds occasionally.
7. Defendant-employer provided plaintiff with a light-duty job of blowing sawdust off furniture on the assembly line with an air hose — which was within Dr. Jones work restrictions. Plaintiff worked full-time until November 19, 1993.
8. On November 12, 1993, plaintiff consulted Dr. Jones reporting a fairly abrupt onset of severe left-leg radicular pain two weeks previously. Dr. Jones scheduled a repeat MRI and returned plaintiff to light-duty work. The MRI showed no evidence of a recurrent herniated disk. Dr. Jones performed a series of epidural steroid injections and prescribed Darvocet. Dr. Jones kept plaintiff on a variable schedule of light-duty work On March 4, 1994, Dr. Jones recommended weaning plaintiff off Darvocet. A repeat MRI was performed, which again showed no evidence of a recurrent herniated disc. Dr. Jones attributed plaintiff's symptoms to a flare-up of inflammation and fibrosis around the nerve.
9. Another repeat MRI was conducted on May 24, 1994, which revealed no abnormality that would explain plaintiff's reported pain — other than perineural scarring. Plaintiff continued to work a variable schedule from four to eight hours daily at light-duty work at defendant-employer.
10. Due to plaintiff's continuing complaints of pain and Dr. Jones' inability to determine any reason for the pain or to provide any satisfactory treatment, Dr. Jones agreed with the rehabilitation nurse provided by the defendants that a referral to another orthopedic specialist would be appropriate.
11. On July 1, 1994, plaintiff was evaluated by Dr. J. Robinson Hicks of Charlotte Orthopedic Specialists. As part of the continuing evaluation by Dr. Hicks, plaintiff underwent a psychological evaluation by Dr. Sallie Duffy on July 26, 1994. Dr. Duffy recommended a structured, comprehensive rehabilitation program.
12. Plaintiff's rehabilitation nurse arranged for plaintiff to participate in a pain management program daily for two weeks beginning August 3, 1993, followed by work-hardening daily for two weeks at The Workplace, with a release to return to work upon completion of the program. Plaintiff attended the program for one day and declined to participate further.
13. By Order dated September 12, 1994, former Commission Executive Secretary Nick P. Davis referred the case to the Commission's Nurses Section for medical management. Teri Sieving, rehabilitation nurse, was assigned to the case.
14. Plaintiff returned to Charlotte Orthopedic Specialists on September 1 and 13, 1994, and saw Dr. Hicks. At that time, Dr. Hicks recommended that plaintiff return to the rehabilitation program. Plaintiff declined to do so. On a return trip on September 19, Dr. Anthony Wheeler examined plaintiff. Dr. Wheeler recommended a functional capacity evaluation and a pain-management program rather than plaintiff's continued use of narcotics.
15. Both Dr. Hicks and Dr. Wheeler approved plaintiff to return to a screw setting job at defendant-employer on October 10, 1994. The screw setting job involved placing a washer and screw together and dropping it into a box. The job could be done alternately standing on a rubber mat or sitting in a chair with a back, which were provided by the defendant-employer.
16. Ms. Sieving first met with plaintiff at his home on October 5, 1994, determining that it would be appropriate for plaintiff to return to the light-duty position of screw setting, as approved by both Dr. Hicks and Dr. Wheeler. Ms. Sieving recommended that defendant-employer provide a job coach — Tim Herlihy from ProActive Therapy — for plaintiff, and that Mr. Herlihy should perform a functional capacity examination on the job site.
17. Ernie McAteer, Human Resources Director for defendant-employer, sent Mr. Minton a letter, dated October 5, 1994, to report to work for the screw setting job on October 10, 1994. However, plaintiff did not show or call defendant-employer.
18. On October 18, 1994, plaintiff went back to work at defendant-employer doing screw setting. Tim Herlihy assisted in job evaluation and job monitoring.
19. From October 28 through November 3, 1994, plaintiff did not show up for work or otherwise report to defendant-employer. Both Ms. Sieving and Mr. Herlihy reported to defendant-employer's for appointments with plaintiff during that time, but plaintiff failed to appear.
20. On October 28, 1994, Ms. Sieving and defendant's rehabilitation nurse met with plaintiff and his attorney. Following that meeting, Ms. Sieving recommended that plaintiff see Dr. Todd Chapman at The Miller Clinic.
21. On November 7, 1994, plaintiff returned to work. On November 11, 1994, plaintiff again failed to show up for work. Both Ms. Sieving and Mr. Herlihy attempted to contact plaintiff at home. Plaintiff hung up the phone on Mr. Herlihy on November 16, 1994. Plaintiff continued to stay out of work and refused to cooperate with Ms. Sieving and Mr. Herlihy.
22. Dr. Chapman evaluated plaintiff on December 14, 1994, ordering a diskogram and CT scan. The diskogram showed only scar tissue. Dr. Chapman returned plaintiff to work for four hours per day at screw setting on January 4, 1995. On January 11, Dr. Chapman recommended that plaintiff be evaluated at Southeast Pain Care for a spinal cord stimulator.
23. During January 1995, plaintiff continued to report to work erratically, without notifying defendant-employer as required.
24. On February 7, 1995, Dr. Mark Romanoff and Dr. Joshua Miller of Southeast Pain Care inserted the spinal cord stimulator recommended by Dr. Chapman. Plaintiff returned on February 10 and requested removal of the spinal cord stimulator because it provided little benefit to him and he did not like the sensations it produced. Dr. Miller then recommended a trial of intraspinal narcotics.
25. A trial epidural catheter was inserted by Dr. Romanoff at Carolinas Medical Center on March 13, 1995. Plaintiff was discharged March 14, 1995, with follow-up at Southeast Pain Care. On April 3, 1995, a permanent epidural catheter was inserted by Dr. Miller. On May 2, 1995, Dr. Miller determined that the catheter had become disconnected. Plaintiff requested removal of the catheter, which was done.
26. On April 27, 1995, Dr. Brian Wilder of Southeast Pain Care, with Dr. Chapman's concurrence, returned plaintiff to work four hours per day with no more than ten pounds lifting and position changes as needed.
27. Following Ms. Sieving's recommendations, arrangements were made for plaintiff to attend Presbyterian Pain Center. He was scheduled to check in on May 30, 1995, but did not show.
28. At Ms. Sieving's request, plaintiff was rescheduled for Presbyterian Pain Center for the next available vacancy, which was July 11, 1995. Dr. Gerald Aronoff and Brian Simpson directed plaintiff's program. Plaintiff checked in and stayed for one week. At the end of the week, plaintiff insisted on going home. He failed to return within the time allowed and, therefore, was considered discharged against medical advice.
29. On August 23, 1995, Dr. Chapman stated that plaintiff's complaints of pain outweighed any objective evidence. He rated plaintiff at 10% permanent partial impairment of the back and found him at maximum medical improvement. Dr. Chapman approved defendant-employer's four job descriptions provided to him as being within plaintiff's physical limitations. The four jobs were: (1) "tape removal" — removal of tape from drawer fronts and sides after the finishing process; (2) "blow off" — using air hose to blow sawdust off assembled furniture products preparatory to finish; (3) "embossing" — operating machine to imprint Kincaid logo on drawer parts; and (4) "patch and putty" — repairing small defects in furniture parts with putty. Dr. Chapman discharged plaintiff from his care, with future visits on an as needed basis.
30. On August 25, 1995, Mr. McAtee sent plaintiff a certified letter directing plaintiff to report to work on August 30, 1995. Plaintiff refused to claim the letter at the post office.
31. During September 1995, plaintiff reported to work sporadically without giving proper notice to defendant-employer when he would not be present.
32. On September 27, 1995, at defendant-employer's request, Dr. Andrea Stutesman examined plaintiff and recommended a functional capacity evaluation.
33. A functional capacity evaluation was performed on plaintiff by Cathy Sametis of ProActive Therapy on October 10, 1995. The results were indicative of poor effort during testing. Plaintiff refused to complete portions of the evaluation and did not appear motivated to return to work. Ms. Sametis recommended that plaintiff return to light duty work at defendant-employer.
34. Defendant-employer made arrangements for Ms. Sametis to evaluate the jobs available to plaintiff. On October 13, 1995, Mr. McAteer sent plaintiff a certified letter to report to work on October 18, 1995, for a meeting and job analysis with Cathy Sametis. However, plaintiff refused to claim the letter at the post office and did not appear at the meeting.
35. At the work site plaintiff was furnished a rubber mat and a chair and various jobs where he could sit, stand, or move around as needed. Additionally, defendant-employer gave plaintiff his choice of several jobs within his physical limitations. The blow off, tape removal, patch and putty, screw setting, and embossing are all jobs essential to the manufacture of furniture and are those which defendant-employer regularly employs workers.
36. During October and November of 1995, plaintiff failed to report for work at defendant-employer. On or about November 14, 1995, plaintiff reported to Donna Annas, Personnel Administrator, that his back condition was worse for about a month. However, during October and November of 1995, plaintiff was observed operating a bulldozer for Woodie Construction Company on mountainous terrain in Ashe County.
37. Plaintiff returned to Dr. Stutesman's office on October 10, 1995, and was seen by Dr. Daniel L. Collins. On November 7, 1995, on a return visit, Dr. Thomas M. Ray concurred with recommendations that plaintiff could perform light duty work, specifically patch and putty, embossing, and screw setting because they presented no apparent risk factors, were not production based, and allowed plaintiff to sit or stand as needed. Dr. Ray recommended a gradual return to work over four weeks. He noted that plaintiff "became visibly frustrated and angered with the description of appropriate job positions." When given the opportunity to select one of the three appropriate job positions — based purely on plaintiff's preference and not on availability — plaintiff stated that he did not want to perform any of these jobs. Plaintiff did not report to Dr. Ray that he had been operating a bulldozer for Woodie Construction Company in Ashe County for a month, beginning the middle of October.
38. Plaintiff returned to Dr. Ray on December 12, 1995, and reported that he worked at Kincaid on November 14 to November 17, 1995, for two hours per day but could not go back to work for four hours. Dr. Ray returned plaintiff to work two hours per day until January 4, 1996. Again, plaintiff did not report his bulldozing activities to Dr. Ray.
39. On January 4, 1996, Dr. Andrea Stutesman evaluated plaintiff, rating him with a 10% permanent partial impairment of the back and returned him to the patch and putty position unrestricted on a full-time basis. Plaintiff did not report to Dr. Stutesman that he had been bulldozing on mountainous terrain in Ashe County during October and November of 1995.
40. During the time that plaintiff was complaining to his doctors that he could not perform light-duty work at defendant-employer, plaintiff was operating a bulldozer for up to six hours a day on mountainous terrain in Ashe County, for as many as three consecutive days, and in a variety of weather conditions, including temperatures in the thirties, with gusting wind and snow flurries, as well as on warm days. Plaintiff would operate the bulldozer for as long as three hours at a time without taking a break. Bulldozing trees and stumps on mountain terrain causes jolting of the operator who is operating the bulldozer, who operates gears and foot pedals using both arms and legs. Over the period of one month, plaintiff bulldozed for at least thirteen days.
41. After bulldozing in Ashe County and making the approximate forty-five minute return trip to Woodie Construction Company at the end of the day, plaintiff would do errands on his way home such as stop by the post office to pick up his mail.
42. In March and April of 1996, plaintiff returned to bulldozing for Woodie Construction Company and was paid at least $500.00 for part of his time at $8.00 an hour.
43. Defendant's Form 24 Application to Terminate Payment of Compensation to plaintiff was approved by the Commission on November 13, 1995. Following this approval, defendant resumed payment of temporary partial disability compensation until January 5, 1996, at which time Dr. Stutesman released plaintiff to return to the patch and putty position with no restrictions.
44. The evidence is unclear as to specific dates, but it appears that after January 5, 1996, plaintiff did return to the patch and putty job for some period of time.
45. After March 7, 1996, plaintiff refused to continue working the patch and putty job, which had been approved by his physicians as within his restrictions. In the opinion of the undersigned, plaintiff did not justifiably refuse this position that was suitable to his capacity to earn wages.
46. On April 4, 1996, plaintiff returned to see Dr. Stutesman and reported that he had not worked since March 7, 1996, when he ceased performing patch and putty at defendant-employer. Plaintiff did not report to Dr. Stutesman that he had been bulldozing since March 7. Dr. Stutesman determined: "The exam reveals multiple nonphysiologic signs and inconstant symptoms that indicate a significant exaggeration of his physical condition." She found no physical findings that supported plaintiff's complaints and no medical basis to keep him from working at the putty and patch position.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. As a result of the compensable injury by accident, plaintiff was temporarily totally or partially disabled for the periods stated in Stipulation 7 and entitled to receive the compensation which defendant-employer has already paid. In addition, plaintiff is entitled to receive temporary total disability compensation at the rate of $252.25 per week from January 6, 1996 through March 7, 1996, less a deduction for any wages he may have earned during this period. N.C. Gen. Stat. § 97-29, 97-30.
2. Plaintiff is not entitled to compensation after March 7, 1996, when he unjustifiably refused work suitable to his capacity. Such cessation of compensation shall remain in effect so long as plaintiff continues to refuse suitable employment. N.C. Gen. Stat. § 97-32.
3. Plaintiff is entitled to have all medical compensation provided by defendant-employer as a result of the compensable injury. The approved medical treatment includes that provided by Dr. David Jones, who was authorized as plaintiff's treating physician. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing Findings of Fact and Conclusions of Law, the Full Commission affirms the holding of Commissioner Mavretic, sitting as Deputy Commissioner, and enters the following:
 AWARD
1. Defendant-employer shall pay plaintiff temporary total disability compensation at the rate of $252.25 per week from January 6, 1996 through March 7, 1996, when he unjustifiably refused suitable employment. Any further award of compensation is suspended until such time as plaintiff ceases to refuse the proffered suitable employment. Defendant-employer is entitled to a deduction for any wages paid plaintiff during this period. This amount has accrued and shall be paid in a lump sum, subject to the attorney's fee awarded below.
2. Defendant-employer shall provide all medical compensation for expenses incurred by plaintiff as a result of his compensable injury. The approved medical expenses include treatment by Dr. David Jones, who was authorized as plaintiff's treating physician.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this Award shall be deducted from the sum due plaintiff and paid directly to his counsel.
4. Defendant-employer shall pay the costs.
This ___ day of March 1998.
 S/ ______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________ THOMAS J. BOLCH COMMISSIONER
S/ ______________ CHRISTOPHER SCOTT COMMISSIONER
DCS:jlr